**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 23-cr-202 (BAH)** |
| | **:** | |
| **KHALI AHMED BROWN (2),** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. On September 20, 2024, Defendant Khali Ahmed Brown pleaded guilty to a three-count Superseding Information, charging him with Conspiracy to Distribute and Possess with Intent to Distribute 100 Kilograms or More of a Mixture or Substance Containing a Detectable Amount of Marijuana, a Mixture or Substance Containing a Detectable Amount of Fentanyl, and a Mixture or Substance Containing a Detectable Amount of Oxycodone, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), (b)(1)(C) and 846; Possessing a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and Assault with a Dangerous Weapon, in violation of Title 22, District of Columbia Code, §§ 402 and 1805.

The Defendant served as the leading public face for the Kennedy Street Crew, functioning as a driver of escalating crew-related violence through beefs he not only incited through his social media activity and music videos, but also personally participated in, as evinced by his admitted conduct. His role within KDY merits a commensurate sentence. For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 213 months' imprisonment, in aggregate, to be followed by five years of supervised release.

I.      FACTUAL AND PROCEDURAL BACKGROUND

A.      KDY and Defendant's Role Within KDY Generally

The Defendant's guilty plea stems from an investigation into the Kennedy Street Crew, also known as "KDY," which operates primarily in Northwest, Washington, D.C. Through multiple years of investigation into the KDY crew—of which the Defendant is both a member and one of its most notorious public-facing figures—law enforcement learned that KDY is among the largest crews in Washington, D.C. based on both territory and its vast membership. Within KDY-controlled territory, law enforcement further identified several commercial businesses, public recreation centers, residences, and day-care facilities that are surrounded by prolific "open air" drug trafficking markets and incidents of violent crime, to include shootings and homicides.

Many of KDY's members are involved in a drug trafficking conspiracy (involving fentanyl, marijuana, cocaine and cocaine base, amongst other narcotics), money laundering, the unlawful possession of firearms (including machineguns), and in some instances, shooting at rival crew members to maintain and control KDY's territory and reputation.

A direct consequence of the KDY Crew's drug trafficking operation, in conjunction with its expansion and protection of crew-controlled territory, is a marked rise in crimes of violence and homicides in the Kennedy Street Neighborhood. Over the duration of the charged conspiracy, from June 2019 to June 2023, the following crimes of violence have occurred in the Kennedy Street Neighborhood: five homicides, resulting in the deaths of seven and the wounding of six additional individuals; one assault with the intent to kill, which resulted in the wounding of three individuals; and 19 assaults with a deadly weapon, which have produced approximately two dozen adult victims. In addition to the seven dead and approximately three-dozen additional victims, seven juveniles have also been victims of the above-listed crimes of violence. Beyond these

incidents, during the same time period, there have been approximately 70 additional reports of unlawful discharges in the Kennedy Street Neighborhood during the same time period. Notably, these statistics only account for crimes of violence and firearms-related incidents in one neighborhood during the time period alleged in the indictment and superseding indictment; it is difficult to estimate with any degree of precision the number of retaliatory and/or crew-related shootings involving KDY in and around the District of Columbia. Put simply, the KDY Crew is a driver of the cycle of violence associated with drug trafficking and firearms that has plagued the Kennedy Street Neighborhood for years.

For his part, the Defendant was among the KDY crew members who sold at least fentanyl, oxycodone, and marijuana and possessed firearms to facilitate the crew's drug trafficking activities, which fueled KDY's operations. The Defendant also served as one of the public faces of the crew, as he, along with co-defendant Tristan Ware, are prolific rappers, known in the rap community by their monikers "Migo Lee" and "Greedy," respectively.

The music videos put a finer point on the dangerousness he presents. Generally, in his videos, the Defendant glorifies violence, referring to himself by the tagline used among KDY crew members, "young and violent", and/or characterizing himself as part of "Seal Team 6" or "ST6", evoking militaristic tactics to eliminate the opposition. He is notorious for producing "diss" music videos taunting rival crew members, including those who have been murdered. As discussed *infra*, NIBIN[1] leads on firearms associated with stash houses controlled by the Defendant provide a

---

[1] "NIBIN technology compares images of submitted ballistic evidence from shooting scenes and recovered firearms and produces a list of possible similar results. Trained NIBIN technicians then conduct a correlation review of these results, identifying NIBIN leads or potential links or associations from the same firearm. A NIBIN lead is an unconfirmed, potential association between two or more pieces of firearm ballistic evidence and is based on a correlation review of the digital images in the NIBIN database." *See* ATF Fact Sheet – National Integrated Ballistic Information Network, *available at* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-integrated-ballistic-information-network.

chilling context for the violent lyrics contained in the Defendant's music videos.

For example, in his music video, "Broke/Dead Opps,"[2] the Defendant raps, "keep riding them bikes, get smoked like Slatt!" "Slatt" is a reference to a decedent from a rival crew, 3500 (read, "Thirty-Five Double O"), who was shot and killed on September 29, 2019, in Washington, D.C. By referencing "Slatt" in a derogatory manner, the Defendant appears to antagonize a rival crew by ridiculing the death of one of its members. Tellingly, among the NIBIN leads linked to the firearms recovered on January 26, 2023, in the 1704 D Street NE stash house discussed further *infra*, one was used to shoot at this same decedent's family's house, suggesting that the Defendant's lyrics in his rap videos extend beyond mere artistic expression. Generally, the Defendant includes provocations against other rival crews, too, including the "Columbia Heights Village" crew ("CHV" or the "V") through lyrics and hand signs, as depicted below. Law enforcement interprets the below hand sign, commonly seen in KDY music videos, as advocating for gunfire directed at members of "CHV".



In a February 23, 2023 music video, posted almost one month after law enforcement searched 1704 D Street NE and arrested the Defendant and Ware, among others, as more fully

---

[2] This is one of the music videos the Defendant proudly describes as a revenue driver for him prior to his incarceration. *See* ECF No. 428, at 1-2, Ex. C.

described *infra*, the Defendant published a music video with Ware, in which both flaunted firearms as shown below.



*Ware, stage name "Greedy"*



*Defendant, stage name "Migo Lee"*

In short, the public image the Defendant sought to project through his music is consistent with the conduct to which he has pleaded guilty in this case. The manner in which he boasts of such conduct, including in his sentencing memorandum, raises questions as to whether this sentencing will serve as inflection point moving forward in the Defendant's life.

To this end, the Government agrees with the Defendant's emphasis on his notoriety and reach by virtue of his music career. The Government does not dispute the impressive number of

views and breadth of audience the Defendant extensively catalogues in Exhibit C to his sentencing memorandum. Indeed, it is this following that has helped the Defendant become the public face of KDY and is a large reason why his above-described "diss tracks" are suspected to have produced real world consequences in the context of fueling greater crew-related beef. As discussed *infra*, this reach within the community, specifically in the context of deterrence, is an important consideration for the Court under the factors articulated in 18 U.S.C. § 3553(a).

### B.    Defendant's Conduct as a Drug Trafficker

KDY operated an open-air drug market in Northwest D.C., including three known drug points within its territory, namely: the 600 block of Kennedy Street NW; the 500 block of Kennedy Street NW; and the 5400 block of Georgia Avenue NW. Prior to the coordinated arrest operation in this case, the Defendant was a consistent presence in the lifeblood of KDY's continued vitality: drug trafficking in the open-air drug market it controls. An example of the Defendant's consistent presence in the open-air drug market in the Kennedy Street Corridor, specifically within the 600 block of Kennedy Street NW, is displayed below:



*Defendant (circled in red), Keion Brown, Juwan Clark, Anthony Bailey*

In total, by the Defendant's admission, he is accountable for the following reasonably foreseeable conduct over the course of his participation in KDY's drug trafficking conspiracy: no greater than 40 grams of fentanyl; no greater than 125 grams of oxycodone; and more than 1,000 kilograms of marijuana, but no more than 2,000 kilograms of marijuana. The converted drug weight for these quantities of narcotics, under the U.S. Sentencing Guidelines, was at least 1,000 kilograms, but no greater than 3,000 kilograms.

The Defendant's role as a drug trafficker for KDY is further elucidated by a review of his social media activity, along with his travel patterns and encounters with law enforcement.

<u>Marketing via Social Media</u>

The first sentencing enhancement agreed upon by the parties is the Defendant's utilization of social media, most regularly Instagram, for the distribution of narcotics through mass-marketing, which is articulated in U.S.S.G. § 2D1.1(b)(7). Throughout his participation in KDY's drug trafficking conspiracy, the Defendant regularly utilized Instagram to advertise his narcotics, most predominantly pills, for sale. Examples of the Defendant's public advertisements, in the form

of Instagram "stories," are below.



The third image, in which the Defendant advertises "real M-30s" for sale, is important to consider in light of the Defendant's admitted conduct. As the Court has seen all too often during the opioid epidemic that has in turn fueled the fentanyl crisis, legitimate oxycodone and pharmaceutical opioids are often marketed by traffickers interchangeably with fentanyl-laced counterfeit oxycodone pills. To this end, the most prevalent counterfeit opioid currently sold on the streets are "M-30s", also known as "blues," "30s," "M boxes," or "jammers," amongst other terms. These pills are pressed to resemble legitimate 30 milligram oxycodone pills, which are stamped "M 30" and are light blue in color. Because of the increasing sophistication in which these counterfeit pills are pressed, it is often impossible to determine, absent laboratory testing, whether a pill is a legitimate opioid or a fentanyl-laced counterfeit variant. A review of the Defendant's Instagram communications, excerpted below, reveal that the Defendant (in green text bubbles)

regularly sold "jammers" to his customers.



These excerpted communications, in the both the general context of the manner in which fentanyl-laced counterfeit oxycodone pills are distributed, as well as the specific details of recoveries from the Defendant over the course of the conspiracy, discussed further *infra*, provide important context for the Court's evaluation of the Defendant's drug trafficking.

Independent of the Defendant's advertisements for pills, the Defendant also regularly boasted on social media about the spoils of his drug trafficking, as seen in the excerpted photographs displayed below.

 

Beyond boasting, the Defendant also regularly posted photographs of his drug inventory, as seen in excerpted photographs below. Such photographs are indicative of the actual narcotics recoveries made from the Defendant's stash houses and airport interdictions over the course of this investigation.



<u>Utilization and Control of Stash Houses</u>

The second sentencing enhancement agreed upon by the parties is the Defendant's maintenance of a premises for the purpose of distributing a controlled substance, colloquially known as the "stash house" enhancement articulated in U.S.S.G. § 2D1.1(b)(12). The first justification for this enhancement stems from an incident on October 10, 2022. On that date, law enforcement discovered some of the Defendant's product, proceeds, and the tools he used to safeguard them at his family residence, located at 2608 Southbridge Court in Bowie, Maryland. In the Defendant's bedroom area within the basement of the residence, opioids, vacuum sealing bags within a suitcase, and more than $14,000 in cash was discovered.



Secreted within the walls in the Defendant's sleeping area was a separate hardshell suitcase, containing various drum magazines, a pistol conversion kit to convert a handgun into a short barrel rifle, additional opioids, and a digital scale.







Beyond the recoveries from the Defendant's quarters, three firearms, as well as numerous live rounds of ammunition, firearms accessories, and large capacity magazines were also recovered. Overall, throughout the residence, law enforcement found and seized nearly $47,000 in

U.S. currency, 103 pounds of marijuana, including in luggage similar to luggage seized from other KDY co-conspirators during interdictions; 66.2 grams of crack cocaine; and an aggregate of 106.4 grams of oxycodone pills and 79.6 grams of methamphetamine pills. All seizures from the residence on October 10, 2022, as well as the trademark hardshell suitcases containing bulk quantities of vacuum sealed marijuana that the Court has seen in various pleadings throughout this case, are depicted in the below images.

 



Equally as notable, though, are the events culminating in law enforcement's presence at the residence on October 10, 2022. That morning, around 4:09 a.m., Prince George's County police received a 911 call for a shooting at the residence, which the Defendant and his brothers, Keion and Miasiah, as well as co-conspirator Jovan Williams inhabited. Despite the Defendant's mother denying to police that anyone had been injured, responding officers noticed multiple bullet holes in the living room window, blood on the living room floor, spent shell casings, and a blood trail on the front entryway near the front door.

Ultimately, law enforcement obtained a search warrant for the residence. At the time of the search, the Defendant and his co-conspirators were conspicuously absent. Meanwhile, at 5:30 a.m., a drive-by shooting involving two suspect vehicles occurred in rival crew territory in Northeast D.C., involving Victim-1. No one was hit by gunfire for this first shooting. But eleven minutes later, Victim-1's brother's residence in Takoma Park, Maryland was also shot at, resulting in non-fatal gunshot injuries to two individuals. And around 6:16 a.m., another drive-by shooting occurred

in Southeast D.C. As detailed further *infra*, some of the firearms discharged at these shooting scenes were found three months later, on January 26, 2023, in yet another KDY stash house that the Defendant exercised control over.

In monitoring the Defendant's cell-site location data and social media activity in early-2023, law enforcement was able to determine that the Defendant appeared to be utilizing a residence outside of KDY territory to advertise narcotics for sale. Specifically, historical and timing and advance cell site location information in January 2023 indicated that the residence where he was most often located was in the 1700 block of D Street NE.

During the same time period, on the morning of January 26, 2023, DEA agents conducted an interdiction at Baltimore-Washington International Airport (BWI), where the Defendant and several other KDY members were interdicted on a return redeye flight from Los Angeles International Airport (LAX) smuggling bulk quantities of marijuana. The Defendant and co-defendant Signou managed to evade law enforcement, but surveilling officers followed their vehicle to 1704 D Street NE. Surveillance officers watched Khali Brown readily enter 1704 D Street NE, followed by Signou, with two pieces of luggage.

Helpfully, the Defendant's social media activity helped law enforcement confirm that the Defendant's suspected stash house was indeed 1704 D Street NE. Specifically, law enforcement was able to compare open-source photos of the interior of 1704 D Street to the Instagram stories posted by the Defendant, and noticed certain distinct characteristics of the living room of the residence that were also present in the Defendant's Instagram advertisements.



Later that same day, upon securing a residential search warrant, law enforcement entered the residence. At the time law enforcement entered the residence, the Defendant was discovered, along with two of his brothers and three other co-defendants. Scattered throughout that same basement of the stash house, law enforcement found ten loaded firearms, two of which were machine guns. Four of those firearms were found in a suitcase resembling that which the Defendant was observed entering the residence with earlier in the day (shown below), and which also contained bulk quantities of marijuana, 351 fentanyl-laced counterfeit oxycodone pills (approximately 39.4 grams), and 50 oxycodone pills.





At the bottom of the basement stairs was another suitcase containing more distribution

quantities of bulk marijuana. Mail matter belonging to the Defendant was also discovered.



That fentanyl was discovered in luggage associated with the Defendant is wholly

unsurprising when reviewing his communications with customers on Instagram. In the below conversation, the Defendant (in green text bubbles) makes clear to a customer seeking "percs," short for Percocets, that the Defendant does not have legitimate pharmaceutical opioids, but does have the lethal street substitute for them: fentanyl.



The Defendant's DNA was included on two of the ten recovered firearms from 1704 D Street—one Glock 17 9mm handgun with an obliterated serial number equipped with a machinegun conversion device; and one Glock 29 10 mm pistol equipped with an extended magazine. Relatedly, the Defendant's brother and co-defendant, Keion Brown, was found in the residence and had his DNA included on three firearms, including a Glock 45 9mm handgun equipped with an extended magazine.

With respect to Keion's gun, the Glock 45, it was linked to two shootings on October 10, 2022, soon after the 2806 Southbridge Court incident: one in Takoma Park at 5:41 a.m., and the

other in Southeast D.C. at 6:16 a.m., each of which are referenced *supra*. With respect to the two firearms containing the Defendant's DNA, according to NIBIN leads, the Glock 29 was used in a December 23, 2022 shooting into a recreation center located in rival crew territory (Riggs Park) in Northeast D.C. Additionally, the Glock 17 was used in a November 18, 2022 shooting at Jackson-Reed High School in Northwest D.C.

A review of the Defendant's communications makes the firearm recoveries from his stash house wholly unsurprising. The Defendant (in green text bubbles below) exhibits clear knowledge of how different firearms perform, including a comparison of the rate that an "AR" (assault rifle) fires as compared to a Glock.



The Defendant also appears to have an extensive knowledge of ghost guns, also known as privately manufactured firearms (PMFs), including potential drawbacks to using such weapons. For example, in the below conversation, the Defendant (in green text bubbles) states that "ghost glizzys", which is a term for a ghost gun that is also fully automatic, often jam. The Defendant

separately tells his confederate that he is able to obtain "witches," a street term for machinegun conversion devices, or "switches," and speaks to the quality of those switches by stating that they are "metal."



Jackson-Reed High School Shooting

As discussed above, the Defendant's DNA is included in the DNA profiles for several of firearms recovered throughout 1704 D Street (depicted below),[3] including a machinegun with an obliterated serial number, which was used in the November 18, 2022 shooting at Jackson-Reed High School in Northwest D.C.

---

[3] The firearm to the left is the machine gun with an obliterated serial number that was found in the common area of the basement of 1704 D Street. The firearm to the right was recovered from within the above-referenced suitcase in a bedroom of the basement that also contained three other firearms, bulk marijuana, fentanyl, and oxycodone pills.



Specifically, this firearm is ballistically linked via NIBIN to the Jackson-Reed shooting. On November 18, 2022, just one month after the shooting at his family residence, a shooting occurred in front of Jackson-Reed High School, located at 3950 Chesapeake Street NW, Washington, D.C. Based upon witness accounts conveyed to MPD investigators, on November 18, 2022, an exchange of gunfire occurred at approximately 2:40 pm, after which a witness (W-1, who was with their spouse at the time) observed a black male (hereafter, "S-1") with a black "Uzi," "spraying bullets" up the street toward Chesapeake Street before jumping into a black four-door vehicle with Virginia tag TXT-6922. W-1 described the Uzi as black with a long 9- to 12-inch clip attached. According to W-1, after shooting, S-1 entered the passenger seat of a black sedan bearing Virginia tag TXT-6922, which was parked facing southbound in the wrong direction.

Approximately 21 shell casings—twelve 9mm casings and nine 40 caliber—were recovered from the scene, mostly from the 5300 block of Fort Drive NW. A review of vehicle registration records confirms that the suspect vehicle with Virginia tag TXT-6922, is registered to Khali Brown. As the Defendant admitted at his plea hearing, he and his confederates instigated the incident. Moreover, the Defendant deliberately carried out the act, driving from Russett, Maryland, immediately preceding the shooting, and returning to the Russett area immediately afterwards.

<u>The Defendant was One of KDY's Frequent Fliers</u>

The practice of smuggling in bulk marijuana from the West Coast is part and parcel to the

KDY DTO. As part of the drug trafficking conspiracy, the Defendant and other KDY members made frequent trips to the Western United States—typically, Los Angeles and other destinations in California—to smuggle into Washington, D.C. bulk quantities of marijuana purchased from dispensaries for resale at inflated prices in the D.C. area. The Defendant participated in this component of the KDY DTO by flying to California no less than 32 times over the course of the conspiracy. These flights resulted in multiple interdictions by law enforcement.

In addition to the January 2023 BWI interdiction described *supra*, the Defendant was caught by DEA agents at a different D.C.-area airport two months prior. On October 25, 2022, just two weeks after the incident at 2806 Southbridge Court, the Defendant, co-defendant Cameron Reid, and two other KDY associates were intercepted at the baggage carousel at Washington Dulles International Airport (IAD) after a K-9 positively indicated upon their traveling party's checked-in luggage arriving back from LAX. Several pieces of luggage were seized, and a search revealed a total of 195.4 pounds of marijuana in vacuum-sealed bags concealed within various hardshell suitcases.



Defendant's Arrest in Connection with the Indictment

These numerous law enforcement seizures and encounters did not deter the Defendant,

though. On June 26, 2023, following the indictment return in the instant matter, the Defendant was arrested with his co-defendants, Ware and Miasiah Brown, at a known stash house at Fifth and O Streets NW that both the Defendant and Miasiah Brown had been surveilled conducting narcotics transactions from in the days and weeks preceding the coordinated arrest operation in this case.

Law enforcement was able to separately identify the apartment as being associated with the Defendant based upon a music video he published shortly before his arrest, excerpts from which are displayed below.







Also concealed within that apartment were six loaded firearms, four of which were machineguns; a high-capacity drum magazine; close to $3,000 in U.S. currency; and numerous bags containing approximately 3.5 kilograms of marijuana packaged for distribution.

## II.    LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available; the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
    a) To reflect the serious of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b) To afford adequate deterrence to criminal conduct;
    c) To protect the public from further crimes of the defendant; and

    d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
    a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        i) Issued by the Sentencing Commission . . . ; and
        ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
    a) Issued by the Sentencing Commission . . . and
    b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

## III.    GUIDELINES CALCULATION

As the Final Presentence Report (ECF No. 421; hereafter, the "PSR") correctly notes, the Defendant's Criminal History Category is I. The Government agrees that the PSR captures the parties' plea agreement that the Defendant entered on September 17, 2024. *See* ECF No. 378.

The Government also agrees that the applicable guidelines sentence for Count One of the superseding information, after acceptance of responsibility and with a converted drug weight of at least 1,000 kilograms but no greater than 3,000 kilograms, and including 2-level enhancements for both the maintenance of a drug premises and the use of mass marketing for drug trafficking, is

108-135 months, with a mandatory minimum of 60 months imprisonment required by statute. The applicable guidelines for Count Two of the superseding information is set forth in U.S.S.G. § 2K2.4(b), which requires that the minimum term of imprisonment, 60 months, be imposed consecutively to any other sentence, pursuant to 18 U.S.C. § 924(c)(1)(A)(i). Finally, under the D.C. Sentencing Guidelines, with respect to Count Three, Assault with a Dangerous Weapon is a Master Group 6 offense, with a resultant recommended guidelines range of 18-60 months. The Court maintains discretion to impose the sentences as to Counts One and Three concurrently or consecutively, in whole or in part.

Thus, with a Criminal History Category of I, the Defendant's applicable U.S. Sentencing and D.C. Guidelines range is, in aggregate, 186 to 255 months, should the Court impose the sentences for Counts 1 and 3 consecutively in full. By contrast, should the Court impose the sentences for Counts 1 and 3 concurrently in full, the Defendant's applicable U.S. Sentencing and D.C. Guidelines range is, in aggregate, 168 to 195 months. In the plea agreement, the parties agreed that a sentence within the aggregate Estimated Guidelines Range would constitute a reasonable sentence considering all the factors set forth in 18 U.S.C. § 3553(a). *See* ECF No. 387, ¶ 6. The parties further agreed that the Defendant is entitled to argue down to the mandatory minimum term of imprisonment required by statute, 120 months, and that the Government would cap its sentencing allocution at the bottom of the D.C. Guidelines range for Count Three, that is, 18 months, or 213 months in aggregate. *Id.*, ¶¶ 5(A), (D).

## IV.    ARGUMENT

The United States recommends that the Court sentence the Defendant to a term of 213 months' incarceration, to be followed by a period of five years of supervised release, given the

nature and seriousness of his offense; his history and characteristics; and the need for the sentence imposed to satisfy the statutory requirements set forth in Sections 3553(a)(2)(A)-(D).

### 1. The Nature, Circumstances, and Seriousness of the Offense

The Defendant played a role in one of the largest street crews in the District of Columbia, KDY. He regularly utilized firearms to further his drug trafficking conduct on behalf of KDY. His proclivity for firearms is not isolated to mere possession; firearms linked to the Defendant were utilized in the Jackson-Reed high school shooting for which the Defendant has accepted responsibility, as well as in a series of suspected retaliatory shootings on October 10, 2022. What's more, communications from the Defendant's social media and phone extractions indicate a working knowledge of not just firearms, but their accessories to convert them to fully automatic weapons.

Contrary to the Defendant's claims in his sentencing memorandum, the Defendant's conduct does not reflect a "youthful burst of misconduct." ECF No. 428, at 5. Although the Defendant's verbiage is startlingly apt, the Government does not share the view that participating in a prolonged exchange of gunfire outside a D.C. public high school in broad daylight during a school day reflects "young impulsivity" on behalf of the Defendant. Put simply, it is good fortune, and nothing more, that the Defendant did not commit a much graver offense on November 18, 2022. A sentence reflecting the danger to the community posed by the Defendant's continued conduct over the course of several years is justified.

Independent from the Defendant's direct involvement in firearms and violence, the narcotics he distributed on behalf of the crew not only devastate local communities, but they further provoke violence, both domestic and drug-rival related, particularly when trafficked as an inherent part of a violent crew's operations. As the crew's territory and power expanded, the Kennedy

Street Corridor has become the scene of violence invariably stemming from the confluence of drug trafficking and firearms in addition to rivalries stoked by the crew. With the assistance of the Defendant and other co-conspirators, KDY commandeered an entire portion of a local community in D.C. and therein established an open-air drug market. These offenses are extremely serious in nature, and the Defendant's sentence should reflect this reality.

The Defendant understandably attempts to minimize his participation in the fentanyl trafficking component of the KDY DTO. This is because the Defendant's participation in the fentanyl trafficking perpetrated by KDY occurred against the backdrop of a widespread, lethal drug epidemic.

According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[4] The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[5] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[6] And, thanks

---

[4] https://www.dea.gov/resources/facts-about-fentanyl.

[5] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[6] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-

in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[7] Here, though, the Defendant was doing more than dealing fentanyl. He was dealing fentanyl that was disguised to look like legitimate oxycodone, which can fatally mislead users.

Despite the Defendant's attempt to distance himself from his own admitted conduct, it is important for the Court to consider how other members of KDY viewed the Defendant's access to "jammers," which is a well-known street term used interchangeably for legitimate pharmaceutical opioids and the fentanyl-laced counterfeit oxycodone pills. For example, co-defendant Kenneth Olugbenga, who by his own admission served as a leader of KDY, regularly referred prospective customers seeking jammers or other pills to the Defendant.



---

2023-cdc-provisional-gun-violence-data.

[7] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

The inference to be drawn from Olugbenga's above-excerpted text messages is clear: when a customer for KDY sought pills, legitimate or otherwise, "Migo Lee," the Defendant, was the person to call.

The Court need not solely rely on the belief of leaders of KDY with respect to the Defendant's access to pills. The Defendant (in green text bubbles below) consistently told customers himself.

From: 4081424245 1bigogpurpin14
Uu Got Some Jammers Brodiee
1/2/2022 1:14:03 AM(UTC+0)

From: 49883536353 ynv.wopskino (owner)
Yea ima call you when I come back outside
1/2/2022 1:14:16 AM(UTC+0)

In summary, the Defendant's admitted conduct exemplifies the most dangerous elements of the Kennedy Street Crew: dealing fentanyl-laced counterfeit oxycodone pills in the community, regularly possessing firearms, including automatic weapons, in connection with drug trafficking, and participating in exchanges of gunfire. The Defendant's conduct is grave, and it merits a sentence within the aggregate Guidelines range.

### 2.    The Defendant's History and Characteristics

Although the Defendant's only prior conviction is for a juvenile offense not scored under the U.S. Sentencing Guidelines, a fulsome review of his criminal history reveals a history of violence. For example, on May 30, 2023, the Defendant was arrested for Assault on a Police Officer and Resisting Arrest. PSR, ¶ 132. On that date, officers were at 1319 5th Street NW (where the Defendant was arrested one month later in connection with this case) for a call for service culminating in the arrest of two unrelated defendants. The Defendant, who was on scene, requested

to speak with a MPD official, so a sergeant responded. The Defendant asked the sergeant whether he knew of an officer who was killed in the line of duty and intimated that the sergeant could be next. In response, the sergeant attempted to place Khali Brown under arrest for his threatening remarks. The Defendant and his brother Miasiah attempted to prevent the arrest; Miasiah Brown grabbed two officers' arms to thwart the arrest, but both the Defendant and Miasiah Brown were ultimately arrested albeit not charged.

This was not the Defendant's first demonstration of aggression towards the police, though. On May 6, 2019, he was arrested for resisting arrest at 623 Longfellow Street NW, where officers had responded to reports of disorderly conduct within Kennedy Street territory. *Id.*, ¶ 127. An associate of the Defendant's was detained and placed in a squad car when the Defendant aggressively rushed towards an officer while screaming at him for placing his associate under arrest. The officer asked the Defendant to back up multiple times, but he refused to comply. When attempting to place the Defendant in handcuffs for safety reasons, he swung his arms and tried to run away. Ultimately, he was arrested but again not charged for this conduct.

Independent of the Defendant's flagrant disregard for law enforcement, he has also exhibited violence towards women. On two separate occasions, the Defendant has been arrested for physically assaulting domestic partners. At age 18, the Defendant punched his girlfriend in the head in a case that was ultimately dismissed due to a non-cooperative victim/witness. *Id.*, ¶ 128. Then, at age 19, the Defendant pointed a gun at the mother of his child while she was holding their son, ordered her to get in the Defendant's car, and when she did not immediately comply, he began strangling her. *Id.*, ¶ 130. This case was similarly charged but ultimately dismissed.

In his sentencing memorandum, the Defendant attempts to emphasize his relative youth, now aged 23, in requesting a downward departure pursuant to U.S.S.G. § 5H1.1 (colloquially

referred to as the "Youthful Offender Amendment"). ECF No. 428, at 3. Because the new language

to the Guideline provision is less than two months old as of the date of this filing, there is,

predictably, a dearth of case law as to what particular circumstances and/or offenses merit a

departure on the basis of youth. The Sentencing Commission's reasoning for its amendment

provides some instruction, however. It explains that: "youthful individuals generally are more

impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop

into young adulthood." U.S.S.G. § 5H1.1, Amendment 829 (backg'd.). To this end, the Southern

District of New York, interpreting the newly revised amendment, analyzed appropriate contexts

in which youth provides a valid basis for a downward departure: "a common theme among those

courts that have allowed reductions on the basis of youth is that the offenses of conviction were

'split-second' and 'hot-headed.'" *United States v. Haylock*, 2024 WL 4691023, at *7 (S.D.N.Y.

Nov. 6, 2024) (quoting *United States v. Rosario*, 2024 WL 3521851, at *7 (S.D.N.Y. July 24,

2024) (collecting cases)).

  The Defendant's prior arrests, abhorrent as they may be, could conceivably be

characterized as such impulsive, split-second behavior. By contrast, the Defendant's conduct for

which he has admitted responsibility in this case does not fall into the category of offenses

contemplated by the Youthful Offender Amendment. He participated in a drug trafficking

conspiracy lasting several years. He regularly possessed firearms in furtherance of that drug

trafficking, and also was discovered on multiple occasions in stash houses containing bulk

quantities of drugs and guns, for which he appeared to exercise control over the activities

conducted therein. The Defendant's admitted conduct was "calculated and deliberate and not the

product of duress," and as such, the Youthful Offender Amendment should not provide the basis

for a downward departure in this case. *See United States v. Delvalle*, 2024 WL 3934989, at *4

(S.D.N.Y. Aug. 23, 2024); *see also United States v. Atkins*, 116 F.3d 1566, 1570-71 (D.C. Cir. 1997) (affirming the denial of a downward departure pursuant to § 5H1.1 because the offense conduct involved firearms).

### 3.    The Need to Promote Respect for the Law and Deterrence

The Defendant's sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The Government acknowledges at the outset that the Court maintains case-specific discretion in determining whether to impose its sentence as to Count Three consecutively or concurrently. *See*, *e.g.*, *United States v. Miller*, 799 F.3d 1097, 1107 (D.C. Cir. 2015). Nevertheless, the Defendant's assault with a deadly weapon occurred on a separate date and as part of a separate occurrence from his other firearms conviction in Count Two.

Perhaps more than any other factor, the need to deter unlawful firearms possession and the use thereof, particularly by someone engaged in drug trafficking on behalf of a dangerous crew, weighs most heavily in favor of a Guidelines sentence where the Defendant's punishment for his D.C. Code offense is imposed consecutively. A separate consecutive sentence for Count Three is justified to punish the Defendant for this separate conduct from the other counts of conviction. It is further justified in order to deter similar conduct, which unfortunately remains prevalent in our District. The Government's agreement to cap its request for a consecutive sentence at the bottom of the applicable D.C. Sentencing Guidelines range accomplishes the aim of § 3553 to impose a sentence that is sufficient, but not greater than necessary to acknowledge the dangerousness of the Defendant's admitted conduct.

With respect to the Defendant's conduct in Counts One and Two, as the Court is well aware, drug trafficking is an inherently dangerous business, and this danger is even more

pronounced when conducted in an open-air drug market, as was the case in this conspiracy. This type of brazen drug trafficking is a magnet for violence, as is borne out by the gun violence statistics associated with the Kennedy Street Crew's ongoing crew beefs.

The need to deter violence associated with drug trafficking, particularly by someone who not only participates KDY's drug trafficking, but possesses firearms in furtherance of this conduct, justifies the serious sentence required by statute in this case. Washington, D.C. has struggled with mounting gun violence on the heels of a high homicide rate in 2023. *See* Emily Davies, John D. Harden, and Peter Hermann, *2023 was District's Deadliest Year in More Than Two Decades*, WASH. POST (Jan. 1, 2024), https://www.washingtonpost.com/dc-md-va/interactive/2024/dc-crime-homicide-victims-shooting-violence/. As emphasized repeatedly throughout this memorandum, simple good fortune, and nothing more, is the explanation for why the Defendant did not contribute to these statistics over the course of his participation with KDY.

This context weighs in favor of a robust sentence as the best measure of deterrence available to the Court. A sentence of 213 months' imprisonment accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. As applied to the Defendant, such a sentence reflects the gravity of his conduct in this case. With respect to general deterrence, such a sentence promotes respect for the law and the safety of the community by serving as a deterrent to crew-affiliated criminal conduct, particularly involving firearms and controlled substances. As the Defendant proudly states in his sentencing memorandum, he has garnered a wide following by virtue of his music videos. A sentence within the Guidelines range will serve the intended purpose of generalized deterrence by demonstrating that the Defendant's conduct, despite his own music lyrics, is not to be glorified.

4.      **Other Factors**

The Government's recommended sentence is also justified to give the Defendant ample time to pursue further educational and vocational training and participate in other programs, including substance abuse treatment, and mental health treatment to hopefully address issues that have impacted his youth and development. *See*, *e.g.*, PSR, ¶ 150. To this end, the Government commends the Defendant for his completion of his GED during his period of incarceration to date. *Id.*, ¶ 156.

Nevertheless, the Government respectfully emphasizes the circumstances of the Defendant's brother's murder, where the Defendant states that he was also present. ECF No. 428, at 1. Not only have KDY crew members targeted other rivals, but other rivals also appear to have targeted the members of the KDY crew, as exemplified by the triple homicide in KDY territory on September 4, 2021, claiming not just the lives of three individuals, including the Defendant's brother, but also resulting in gunshot injuries to the Defendant and co-defendant Anthony Bailey. According to the allegations contained in the indictment brought in connection with this incident, the Defendant's brother was murdered by members of a conspiracy whose purpose was to shoot and kill individuals associated with the Kennedy Street Crew in retaliation for a shooting that occurred earlier the same day. The realities and grave danger posed by gun violence is not abstract for the Defendant. During this period of incarceration, the Defendant has potential to reroute himself to a path of productivity, growth and healing.

V.    **CONCLUSION**

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 213 months of imprisonment, to be followed by five years of supervised release. The Defendant served in a public-facing capacity for one of the largest, most notorious and violent street gangs operating in the District today. The Defendant's actions were a direct driver of crew-

related violence not just within the Kennedy Street Neighborhood, but throughout the D.C. Metropolitan Area. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ Matthew W. Kinskey*
MATTHEW W. KINSKEY
SITARA WITANACHCHI
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 1023007 (Witanachchi)
Assistant United States Attorneys
U.S. Attorney's Office
Violence Reduction & Trafficking Offenses
601 D Street, NW
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2024, a copy of the United States' Sentencing Memorandum was submitted via CM/ECF, which will transmit to Cary Clennon, Esq., counsel for Defendant Khali Ahmed Brown.

_/s/ Matthew W. Kinskey_
Matthew W. Kinskey
Assistant U.S. Attorney